UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

Plaintiff,

v.

LAVONTE SAMPSON

Defendant.

_____/

Case No. 21-CR-20732

U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITAL UNDER RULE 29 AND FOR A NEW TRIAL UNDER RULE OF CRIMINAL PROCEDURE 33 [ECF NO. 109]

### I.    Introduction

On January 30, 2024, Lavonte Sampson was convicted by a jury for Sex Trafficking of Children under 18 U.S.C § 1591(a) ("Count 1") and Production of Child Pornography under 18 U.S.C § 2251(a) ("Count 2").

During trial, Sampson made an oral motion for judgment of acquittal under Fed. R. Crim. Pro. 29, which the Court denied. Sampson renewed his Rule 29 motion in writing. In the same brief, Sampson also moves for a new trial under Fed. R. Crim. Pro. 33. The motions were filed on February 13, 2024. The Government responded on March 18, 2024, and Sampson did not reply. Upon review of the briefing and applicable authority, the Court concludes oral argument will not aid in the resolution

1

of this matter. Accordingly, the Court will resolve motions on the briefs. See E.D. Mich. L.R. 7.1(f)(2).

For the reasons set forth below, Sampson's Rule 29 and 33 motions are denied.

## II.    Factual Background

The factual background of this case has been discussed several times in previous opinions and orders. *See* ECF Nos. 60, 84, 86, 88, 91, and 103. The Court incorporates the factual background stated in those entries by reference.

## III.    Applicable Law and Analysis

### A. Sampson's Rule 29 Motion

To prevail on a motion for judgment of acquittal under Rule 29, a defendant "bears a heavy burden." *United States v. Maliszewski*, 161 F.3d 992, 1005 (6th Cir. 1998). He must show that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[.]" *United States v. Arnold,* No. 15-CR-20652, 2024 WL 915533, at *1 (E.D. Mich. Mar. 4, 2024) (quoting *United States v. Persaud*, 866 F.3d 371, 380 (6th Cir. 2017)).   The Court "'views the evidence 'in the light most favorable to the prosecution.'" *Id*. In reviewing a motion for judgment of acquittal, the Court "may neither weigh conflicting evidence nor assess the credibility of witnesses[.]" *Id.* (quoting *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984).

2

In Sampson's Rule 29 motion, he challenges count 2 of the indictment. Specifically, he maintains that "the government failed to prove that Sampson had sex with [MV-1] 'for the purpose of producing any visual depiction of such conduct[.]'" ECF No. 109, PageID.1970 (citing 18 U.S.C. § 2251(a)). "This specific intent requirement is critical[,]" Sampson says, because "there is no *mens rea* requirement regarding age" and "the statute subjects a person to a 15-year mandatory minimum sentence." *Id*.

A person violates § 2251(a) when he "employs, uses, persuades, induces, entices, or coerces any minor to engage in ... any sexually explicit conduct for the purpose of producing any visual depiction of such conduct." 18 U.S.C. § 2251(a). The Sixth Circuit has determined that "§ 2251(a) contains no language requiring the defendant to sexually engage with the minor for the sole purpose of producing visual depictions." *United States v. Frei*, 995 F.3d 561, 566 (6th Cir. 2021). Instead, § 2251 is a specific-intent crime, "which requires that the defendant must purposefully or intentionally commit the act that violates the law and do so intending to violate the law." *Id*. (citing *United States v. Ramamoorthy*, 949 F.3d 955, 961 (6th Cir. 2020) (defining specific intent)). In other words, to convict Sampson under § 2251(a), a jury must find that he purposefully or intentionally had sex with MV-1 with intent to produce a visual depiction of the act.

Sampson believes the evidence adduced at trial showed that he "engaged in sexual activity with Savannah and took a single short video, not that he had sex with Savannah in order to take a video."  ECF No. 109, PageID.1971.

The evidence, viewed in the light most favorable to the prosecution, demonstrated that Sampson and MV-1 exchanged Facebook messages prior to their sexual encounter. He told her that they could "trap" together, and he requested pictures from her that later appeared in commercial sex advertisements. ECF No. 116, PageID.2018. Sampson filmed himself and MV-1 having sex. Soon thereafter, he sent that video to a potential commercial sex customer, attempting to arrange a commercial sex date for MV-1. It is true that, as Sampson points out, he did not press record on the video until after the sex act had begun, and he did not set up recording equipment. Due to the existence of other evidence, however, the absence of these facts does not render the jury's finding implausible. Moreover, MV-1 testified that she did not know she was being recorded, ECF No. 118, PageID.2132, suggesting that Sampson had a calculated intention to capture video footage of the sexual encounter without her knowledge. Further, this timing indicates a deliberate intention to document the sexual act, which may imply that Sampson—engaging with MV-1 to have sex—had additional motives beyond sexual activity. In these circumstances, a rational trier of fact could find that Sampson had sex with MV-1 for multiple purposes, including the production a visual depiction.

For these reasons, the Court will deny Sampson's Rule 29 motion.

### B. Sampson's Rule 33 Motion

In his Rule 33 motion, Sampson argues that "[n]umerous errors occurred during Sampson's trial that had the cumulative effect of depriving Sampson of his constitutional right to a fair trial." ECF No. 109, PageID.1973. "[T]aken together," Sampsons says, "[these errors] . . . illustrate that Sampson's trial was tainted by unfairness such that an order for a new trial is proper." *Id*.

Rule 33 (a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant new trial if the interest of justice so requires."  It is well established that "Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). Sampson points to several purported "errors" that he believes warrant a new trial: (1) "Judicial Bias and Failure to Recuse"; (2) "Discovery Issues"; (3) "Jurors' Discussion of Evidence while Prejudiced Juror, who was Ultimately Dismissed as an Alternate, Remained on Jury"; (4) "Prosecutorial Misconduct/Napue Violations"; and (5) "Inaccurate Transcripts." ECF No. 109, PageID.1973-87. The Court will discuss each issue below.

### (1) Judicial Bias and Failure to Recuse

On the first day of trial, before selecting a jury, Sampson made an oral motion for the Court to recuse under 28 U.S.C. § 455(a). He argued that the Court had

predetermined his guilt. The Court denied the motion orally on the record and in a subsequent written order. Sampson argues that a new trial is warranted because he believes the basis for the Court's denial, as stated on the record, was "unclear." ECF No. 109, PageID.1974. However, the rationale for the Court's denial of Sampson's motion for recusal has been clarified in a written opinion. *See* ECF No. 91. In his motion, Sampson also argues that a new trial is warranted based on his belief that the Court predetermined his guilt. The Court rejects this argument for the reasons stated in its Opinion and Order Denying Defendant's Oral Motion for Recusal of Judge. *See id*.

Sampson advances several additional arguments for a new trial. He first avers that "the Court's conduct during the testimony of the complainant, [MV-1], further gave the impression of bias against Sampson." ECF No. 109, PageID.1974. On January 25, 2024, the minor involved in this case testified. During cross examination, MV-1 made unsolicited statements that can be properly classified as an emotional "outburst." It involved MV-1 yelling and cursing while on the witness stand, leaving the courtroom, and continuing to yell as she moved down the hallway. Sampson believes the Court "did nothing to intervene during" the outburst, and "took no action when she absented herself from the trial." *Id*. He says the Court's response "sent a clear message to the jury [that] the Court sympathized with [MV-

6

1] to such an extent that it would allow her to make a mockery of the trial proceedings[.]" *Id.*

The Court's response to MV-1's outburst did not show sympathy, and it did not permit her to "make a mockery" of trial proceedings. As the Government notes, when "MV-1's temperament escalated, the Court called for a break – signaling to the jury that the Court would not permit such conduct." ECF No. 116, PageID.2020. Further, the Court told the jury that MV-1 "said some things that she should not have said, and the things that she said were totally out of order."   ECF No. 119, PageID.2239. It also instructed the jury that "the things [MV-1] said should not prejudice you against the defendant or defense counsel or anyone else in the courtroom." *Id.*, at 2240.

Sampson maintains that the "anyone else in the courtroom" language was "gratuitous" and made the instruction "confusing" because "the Court should have made it clear to the jurors that they could consider the outburst and what was said as evidence of [MV-1's] credibility and of what Sampson had an opportunity to observe when he interacted with her." ECF No. 109, PageID.1975. But Sampson did not object to the instruction and did not ask the Court to include any of the language he now references. Sampson says "[a]t least one juror believed she was not permitted to consider [MV-1's] outburst in any way." ECF No. 109, PageID.1975 (citing ECF No. 106, PageID.1648 (On January 26, 2024, a juror said, in reference to MV-1's

outburst, "I need to disregard all of that.")). The juror made this statement on a Friday. On the following Tuesday, the Court instructed the jury about its duty to assess MV-1's credibility. It stated,

> another part of your job as jurors is to decide how credible, or believable, each witness was. This is your job, not mine. It is up to you to decide if a witness's testimony was believable and how much weight you think it deserves. You are free to believe everything that a witness said or part of it or none of it at all, but you should act reasonably and carefully in making these decisions.

ECF No. 121, PageID.2692. The Court also instructed the jurors that:

> [n]othing that I have said or done during this trial was meant to influence your decision in any way. Nothing said in these instructions is meant to suggest or convey in any way what verdict I think you should find. What the verdict shall be is the sole and exclusive duty and responsibility of the jury. You must decide for yourselves if the government has proved a defendant guilty beyond a reasonable doubt.

*Id*., at PageID.1260.

Based on its explicit instructions to the jury, the Court finds that the jurors were informed that the determination of MV-1's credibility was entirely their own. They were also made aware that her testimony could be considered in full or in part. Contrary to Sampson's position, the Court response to MV-1's outburst did not give rise to the appearance of bias, it did not express any personal views regarding her credibility, and the Court informed the jury of the full scope of its duty to assess MV-1's credibility.

In all, the Court: (1) noted that MV-1's outburst was improper, (2) instructed the jury not to hold the outburst against Sampson or his counsel, (3) polled the jurors to ensure that anyone who heard the outburst could remain fair and impartial, (4) excused the only juror who expressed hesitation in remaining impartial, and (5) properly instructed the jury to evaluate MV-1's credibility. On balance, the record does not demonstrate that a substantial legal error occurred, the Court's actions do not appear to be biased against Sampson, and the interests of justice do not require a new trial.

The court turns to discuss the purported "Discovery Issues" next.

**(2)  Discovery Issues**

Sampson points to several purported discovery issues that he believes warrant a new trial: (a) the "Denial of Request for *Giglio* Material"; (b) "Restrictive Discovery"; (c) the "Admission of Shannon Martucci's Testimony"; (d) "Inaccurate Transcripts." ECF No. 109, PageID.1976-83. The Court will discuss each issue in turn.

**(a) The "Denial of Request for *Giglio* Material"**

On January 17, 2024, the Court entered an "Opinion and Order Denying Defendant's Motion for *Brady* Material [#70] and Denying Defendant's Ex Parte Motion for Rule 17(c) Subpoena [#71]". *See* ECF No. 84 (the "Opinion"). In the Opinion, the Court denied Sampson's requests for MV-1's mental health treatment

records from therapy, counseling, social service providers, Child Protective Services, Detroit Children's Hospital, and the Michigan Department of Health and Human Services from 2020 onward. *See id*. He believes that these records were relevant to the jury's evaluation of MV-1's credibility. As such, Sampson asserts that "[g]iven the centrality of Savannah's testimony, it was error for the Court to deny Sampson's request for impeachment material." ECF No. 109, PageID.1976.

Along these lines, Sampson avers that the Opinion "used the post-conviction materiality standard when adjudicating a pre-trial motion to deny Sampson evidence he is constitutionally entitled to." ECF No. 109, PageID.1976. "That is," Sampson says, "it discussed the evidence of Sampson's guilt before it even knew what the evidence was to deny Sampson's request for impeachment material." *Id*. Sampson also submits that the Court conflated the standards under *Brady* and Fed. R. Crim. Pro. 17, thereby "fail[ing] to appreciate that *Brady* evidence does not have to be admissible to be turned over to the defense." *Id*., at PageID.1977.

In the Opinion, the Court described several reasons—beyond admissibility—to support its ruling that Sampson was not entitled to the records under *Brady* or Rule 17. For example, on the issue of privilege, it stated that:

> A criminal defendant does not have an unassailable right to discover and use confidential or privileged information to impeach a witness in advance of trial. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 53-54 (1987). In *Ritchie*, a plurality held that a defendant's right to confront witnesses against him was not violated when a child protective service agency refused to turn over its confidential records to him,

because those records were privileged under state law. *Id*. at 43-46. The *Richie* plurality determined that "the right to confrontation is a trial right" and declined "to transform the Confrontation Clause into a constitutionally compelled rule of pretrial discovery." Id. at 52. In so finding, they stated that "[t]he ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." *Id*. at 53.

Defendant does not address privilege in his briefing even though the psychotherapist/patient evidentiary privilege has been well-established in this circuit for decades. *See United States v. Hayes*, 227 F.3d 578, 581-82 (6th Cir. 2000) (citing In re Zuniga, 714 F.2d 632, 637 (6th Cir. 1983)). The Supreme Court recognized the psychotherapist/patient privilege in *Jaffee v. Redmond*, 518 U.S. 1, 10-11, 15 (1996) (explaining that recognizing psychotherapist/patient communications as privileged will facilitate "an atmosphere of confidence and trust[,] . . . [and] serves public ends [because] the mental health of the American citizen . . . is a public good of transcendent importance.").

In his Reply brief, Defendant erroneously argues the psychotherapist/patient privilege does not apply in criminal actions because *Jaffee* was a civil case. The *Jaffee* court held that patient communications to a psychotherapist are protected from compelled disclosure under Federal Rule of Evidence 501. *Jaffee*, 518 U.S. at 15; *see also United States v. Sheppard*, 541 F. Supp.3d 793, 799-800 (W.D. Ky. 2021) (rejecting the defendant's argument that the psychotherapist/patient privilege does not apply in criminal cases); Fed. R. Evid. 101(a)-(b) (the Federal Rules of Evidence "apply to proceedings in federal court" defined to include "criminal proceeding[s]."). Moreover, the *Jaffee* court did not limit the privilege to civil cases, and neither has the Sixth Circuit. *See Hayes*, 227 F.3d at 581-82 (relying on the psychotherapist/patient privilege to affirm the district court's suppression of a criminal defendant's statements to his therapist) . . .

ECF No. 84, PageID.1081-82. So, Sampson failed to show that the psychotherapist/patient privilege did not apply to the records he requested.

Additionally, the Court cited *Brady*. See *Id*., at PageID.1078 (noting that "[T]he rule stated in *Brady* applies to evidence undermining witness credibility.") It cited *Giglio*. *See Id*., (citing *Wearry v. Cain*, 577 U.S. 385, 393 (2016) (citing *Giglio v. United States*, 405 U.S. 150, 153-55 (1972) ("impeachment evidence falls within *Brady* '[w]hen the reliability of a given witness may well be determinative of guilt or innocence.'")). And the Court cited Rule 17(c)'s requirement that "[a] party seeking to obtain records by means of a Rule 17(c) subpoena must show the information being sought is relevant, admissible, and specific." *See Id*. (citing *United States v. Hughes*, 895 F.2d 1135, 1145-46 (6th Cir. 1990)); *see also Id*., (noting that the Supreme Court has "held that production pursuant to Rule 17(c) is appropriate where the movant shows: (1) The documents are evidentiary and relevant; (2)They are not otherwise procurable, with due diligence, in advance of trial; (3)The party cannot properly prepare for trial without such production and inspection in advance of trial; and (4)The application was made in good faith and is not a fishing expedition.").

Applying these standards, the Court held that "Defendant ha[d] not shown with specificity the relevant and admissible evidence that may be contained in the minor victim's mental health records." *Id*., at PageID.1082. It reasoned that:

> Defendant must make some kind of factual showing supporting a reasonable belief that the records will contain inconsistent statements or exculpatory information. Defendant's only basis for requesting these records is a broad generalization that a person's mental health may be

relevant to her credibility. Absent from Defendant's briefing is any factual basis supporting his argument that the minor victim's mental health records will contain exculpatory information. Defendant relies on the social worker's report that the minor victim suffers from self-harm and suicidal ideation; however, the defendant does not set forth any facts suggesting that these medical conditions relate to a witness's credibility.

Defendant also speculates that the minor victim may suffer from a conduct disorder, but again fails to make any connection between this disorder and witness credibility. Indeed, Defendant's briefing appears to concede the speculative nature of his request. *See* ECF No. 70, PageID.999 (emphasis supplied) ("the requested records *may* reveal why the minor's story has changed."). Defendant's claim that "it is critical that the defense understand the extent of counseling received, who she spoke to about the alleged events, [and] how these people reacted," suggests Defendant's request is a quintessential fishing expedition. *Id*. Defendant does not address with factual specificity how this information would be favorable to his defense.

If this type of vague request became a valid basis for an in-camera review of mental health records, then the Supreme Court's requirement that a defendant "establish a basis for his claim that the records sought contain material evidence," would be rendered meaningless. *United States v. White*, 492 F.3d 380, 410 (6th Cir. 2007) (quoting *Ritchie*, 480 U.S. 58 n.15). Instead, a defendant would only need to state that a victim-witness had sought mental health treatment before the entirety of a victim's psychotherapist records were subject to in-camera review. Given the current record, a decision to maintain the confidentiality of the minor victim's records would honor the well-settled law of *Ritchie*.

At the hearing, the Defendant relied on the fact this Court in *United States v. Neuhard*, recognized that some courts have conducted an in camera review of a witness's mental health records in a criminal case. No. 15-cr-20425, 2016 U.S. Dist. LEXIS 161469 (E.D. Mich. Nov. 22, 2016). However, this Court recognized that[,] in those cases, the defendant had "articulated specific facts pertaining to the high probative value of the records," unlike the *Neuhard* defendant. *Id*. at *32. Thus, this Court did not grant the *Neuhard* defendant's request for

a Rule 17(c) subpoena. *Id*. Similar to the circumstances in *Neuhard*, Defendant has not articulated specific facts pertaining to the relevance and high probative value of the mental health records he seeks . . .

Moreover, Defendant's reliance on the fact the minor victim is the sole person with firsthand knowledge of the alleged events does not carry the day when evidence of his guilt is on video, cell phones, websites, in pictures, and on social media. The circumstances here are distinguishable from the defendant in *United States v. Castillo*, Case No. 16-20344, 2016 WL 4761777 (E.D. Mich. Sept. 13, 2016), the case Defendant heavily relies upon in support of his request for the minor victim's records.

As an initial matter, the Castillo court, like Defendant, fails to discuss *Jaffee* or *Ritchie* or privilege in any way. In *Castillo*, the district court ordered that a victim's psychological and medical records be produced to the court for in camera review, where the defendant made a showing that the records contained information about the victim's medical history that was potentially exculpatory. *Id*. at *7-9. The victim was anticipated to be the Government's sole witness at trial. *Id*. at *8. The defendant in Castillo was charged with sexually assaulting a victim while she was asleep—allegedly under the influence of prescription sleep aid medication—and after she had allegedly denied giving consent. *Id*. at *1. The defendant acknowledged that the victim was on sleep medication but argued that she had previously given consent to engage in sexual acts while she was asleep. *Id*.

Unlike the circumstances here, the question of the defendant's guilt or innocence in *Castillo* turned heavily on the victim's testimony, and her use of prescription medication, and the effects of such medication was relevant to the defense. Thus, in *Castillo*, the court ordered production of the victim's counseling and medical records for in camera review, because the defendant articulated specific facts pertaining to the probative value of the records.

These facts are not present here. The minor victim's testimony will not be the sole evidence against Defendant. She was wide awake during these crimes. There is additional evidence against Defendant, not just the minor victim's account, including a video of Defendant engaged in sexual intercourse with the minor victim, commercial sex

ads posted by Defendant on the internet, Facebook records, photographs, and surveillance video of the minor victim at the motel where Defendant trafficked her, as well as pictures of Defendant in bed with the minor victim at his home. This evidence will be offered in addition to testimony from law enforcement officers who rescued the minor victim and who recovered cellular phones from her and an adult sex worker who conspired with the Defendant to exploit the minor child. Unlike the *Castillo* defendant, the question of Defendant's guilt or innocence will not turn solely on the minor victim's testimony.

Because Defendant has not set forth any factual basis suggesting the minor victim's mental health records will contain relevant, exculpatory information, or that these records are admissible, he is not entitled to the minor victim's mental health records and his request for *Brady* material and for a Rule 17(c) subpoena will be denied. The Court further concludes that Defendant's confrontation rights will be "amply protect[ed]" by his ability to thoroughly question the minor victim about her purported changing accounts of the alleged events during cross examination. *See United States v. DeLeon*, 426 F.Supp.3d 878, 921 (D.N.M. 2019).

ECF No. 84, PageID.1081-1087.

As demonstrated by the rulings referenced *supra*, the Court did not apply a post-conviction materiality standard under *Brady*. And the inadmissibility of the records—a relevant consideration under Rule 17(c)—was not the sole factor supporting the Court's denial of Sampson's motion. Rather, the Court concluded that Defendant was not entitled to the records because, *inter alia*, he: (1) did not set forth specific facts demonstrating their relevance to MV-1's credibility, and (2) unlike *Castillo*, he did not show that the reliability of MV-1 would potentially be

determinative of guilt or innocence, as required for impeachment evidence to fall within the *Brady* rule.[1]

Next, Sampson believes the mental health records "would have impeached a key witness, that is, [MV-1]." ECF No. 109, PageID.1981. And he says, "the defense could have explored the relevance of any diagnoses with the government's expert, Shannon Martucci." *Id*. As such, he avers that the records were material and relevant to the credibility of MV-1. *Id*. Under *Brady*, "[e]vidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Wearry*, 577 U.S. at 392 (quoting *Giglio*, 405 U.S. at 154). To prevail on his Brady claim, Sampson "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id*.  As with Sampson's initial request for disclosure of the mental health records, he fails to describe specific evidence that may be contained in those records and explain how that evidence would be material to MV-

---

[1] The Court also held that "Defendant . . . failed to show that he cannot obtain the requested information from other sources, a prerequisite for obtaining a Rule 17(c) subpoena." *Id*., at PageID.1084. And the Court noted that Defendant "sought the minor victim's mental health records on the day after the original date for trial in this matter." *Id*., at PageID.1087. Thus, the Court discussed "the untimeliness of Defendant's requests[,]" and concluded that his  requests were "inordinately past due and should have been raised before the Court at a much earlier time during the instant proceedings." *Id*. In his motion, Sampson does not argue that these rulings were erroneous.

1's credibility as a witness. Accordingly, Sampson fails to show that legal error occurred when the Court denied his requests.

Sampson also claims that his right to a fair trial was impeded because the government did not previously notify him that MV-1 "blames Sampson for her miscarriage." ECF No. 109, PageID.1978 (internal quotations omitted). The Court already denied Sampson's motion for a mistrial on this ground because Sampson failed to show how that information had any reasonable likelihood of affecting the outcome of the case:

> Defendant says nothing about prejudice or how that prejudice took its form at trial. Instead, he states that, "these statements are also concerning given the government's insistence that Mr. Sampson was engaged in a fishing expedition when he sought evidence related to Savannah's credibility by way of her diagnoses, medications, and mental health conditions." ECF No. 93, PageID.1183. Defendant's argument does not demonstrate that he was prejudiced by the Government's alleged failure to disclose, and it does not show that a mistrial is warranted.

ECF No. 103, PageID.1286–87. Sampson asserts that "the government's statements raise legitimate concerns that evidence going to Savannah's credibility was not disclosed in violation of *Giglio v. United States*, 405 U.S. 150 (1972)." ECF No. 109, PageID.1978.

As the Government notes, however, he still fails to show a reasonable probability that, had the evidence been timely disclosed to the defense, the outcome might have been different. Sampson does not explain "how asking MV-1 whether

she blames Sampson for her miscarriage would undermine the other significant evidence presented against him, including MV-1's testimony, the sex video, the photographs of MV-1 and Sampson, the undercover operation, the Facebook messages between MV-1 and Sampson, and the cell-site location information of Sampson's cellular phone." ECF No. 116, PageID.2025. And he does not address the potential prejudice that could occur as a result of the "jury hearing that the 15-year-old victim suffered a miscarriage while with Sampson." *Id*. Accordingly, Sampson fails to demonstrate that disclosure of the information sought would have undermined confidence in the outcome at trial. The Court is not persuaded that a *Brady* violation or substantial legal error occurred to such a degree that his right to a fair trial was impeded.

Next, Sampson avers that two "combined errors had the cumulative effect of violating his constitutional rights to due process and a fair trial, and therefore require that Sampson be granted a new trial." ECF No. 109, PageID.1981.

First, he says "the government failed to call anyone who could impeach [MV-1's] prior inconsistent statements." *Id*. He believes that the Government was required to call either of the two people who conducted the recorded forensic interview of MV-1, and he believes the Government "trained" MV-1 "to falsely claim lack of knowledge about her prior statements." ECF No. 109, PageID.1981. Second, Sampson submits that "by thwarting the defense's request for information

concerning what happened in between the complainant's first and second forensic interviews, Sampson was unable to elicit information critical to his theory that the complainant was untrustworthy and potentially coached into making the statements she did." ECF No. 109, PageID.1982.

These arguments are without merit because it is Sampson's responsibility to call the witnesses he would like to question, and his accusations regarding the Government coaching MV-1's testimony are unsubstantiated. Further, if Sampson believed that MV-1 was coached, then he should have explored the topic of coaching on cross examination. Accordingly, Sampson fails to demonstrate that legal error occurred, that his right to a fair trial was violated, and that the interests of justice warrant a new trial.

### (b) Restrictive Discovery

During discovery, the Government declined to provide the defense a copy of the download of MV-1's cellular phone. It instead made the data available for review at the United States Attorney's Office pursuant to Federal Rule of Criminal Procedure 16. This issue was subject to Sampson's previously filed motions to compel [ECF Nos. 30 and 55]. The government opposed the motions, and the Court heard oral argument on the matter. At the hearing, "the parties informed the Court that they had reached an agreement regarding the discovery items at issue in the Motions," which entailed the defense reviewing the download at the United States

Attorney's Office. ECF No. 57, PageID.385. For this reason, the Court declared Sampson's motions to compel moot. *Id*.

Sampson asserts that, because "the government produced the Cellebrite copy of [MV-1's] entire cellphone to the defense as Exhibit 14 just before trial[,]" their failure to produce the data during discovery "raises legitimate questions about its claimed inability to produce the evidence during the months leading up to Sampson's trial." ECF No. 109, PageID.1983. "Had the defense had access to this information to review at its convenience at its office," Sampson avers, "trial preparations would have looked very different." *Id*.

Even if Sampson had not agreed to the very same discovery process he now challenges, the Government's method of producing MV-1's cell phone data was not improper under Fed. R. Civ. P. 16. *See Doe v. Boland*, 630 F.3d 491, 495 (6th Cir. 2011) ("Even though Criminal Rule 16(a)(1)(E) usually allows defendants to copy material documents in the government's possession, the Act requires federal courts to deny these requests when the materials contain child pornography, instead permitting the defendant only to have an ample opportunity for inspection, viewing, and examination at a Government facility."). As the Government notes: "(1) the indictment charged a v[e]ry narrow timeline of seven days, (2) the cellular phone contained child pornography, nude photographs of MV-1 . . . , and (3) the government produced copies of relevant portions of the download." ECF No. 116,

PageID.2027. The Court finds that Sampson had ample opportunity for viewing, inspection, and examination of the records at a government facility. Thus, with respect to the restrictive discovery process, the interests of justice do not require a new trial.

### (c) Admission of Shannon Martucci's Testimony

Next, Sampson argues that "[t]he Court erred when it permitted Shannon Martucci to testify at Sampson's trial."  ECF No. 109, PageID.1983. "She was clearly unqualified to opine on the subject matters she testified about" Sampson says. The Court previously concluded that Ms. Martucci "can be qualified as an expert witness in the subject matter pertaining to the relationships and emotional aspects of child sex trafficking victims and their traffickers." ECF No. 60, PageID.922. However, Sampson believes that trial proceedings revealed her lack of qualification because "[s]he claimed that she kept up with the literature but was unable to identify a single study showing dissociation impacts adolescent memory during traumatic events, she testified that she did not know what confabulation was (despite its close association with dissociation), and she lacked familiarity with what is one of the most widely-known studies on adult suggestibility." ECF No. 109, PageID.1983. Sampson also notes that, "Ms. Martucci was [] 'uncomfortable' discussing whether dissociation was a controversial subject despite being an alleged expert on the subject." *Id*.

Rule 702's requirement that an expert witness' must "establish [her] expertise by reference to skill, experience, training, or education" has "always been treated liberally." *Pride v. BIC Corp*., 218 F.3d 566, 577 (6th Cir. 2000). For the reasons stated in its previous opinion, at ECF No. 60, PageID.922, the Court concludes that Ms. Martucci was qualified to testify. And her trial testimony did not negate her qualifications or give rise to legal error.

Finally, Sampson avers that "[t]he Court further erred in not excluding Martucci under Rule 16." ECF No. 109, PageID.1984. As Defendant points out, "[t]his was the subject of extensive briefing, which need not be repeated here." *Id*. The Court entered an Opinion and Order addressing the issue on January 18, 2024. *See* ECF No. 86. Sampson now urges the Court to reconsider its prior ruling.

Motions for reconsideration may be brought within 14 days after entry of the order upon the following grounds: a mistake made by the Court, an intervening change in controlling law, or new facts warrant a different outcome, and the new facts could not have been discovered with reasonable diligence before the prior decision. *See* E.D. Mich. 7.1 (h)(2)(A)-(C).

Sampson's motion is untimely, and it presents no basis for the Court to reconsider its prior ruling. He says "[t]he Court's error in permitting this testimony despite the government's violation of its discovery obligations under Rule 16 is demonstrated by a recent decision" in *United States v. Mrabet*, No. 23-00069, ECF

No. 44 (S.D.N.Y. Nov. 27, 2023). ECF No. 109, PageID.1984. *Mrabet* was decided well before Sampson moved to exclude Ms. Martucci's testimony. Thus, it is not an "intervening change in controlling law."

The Court declines to change its prior rulings. Accordingly, for the reasons stated in ECF Nos. 60 and 86, the admission of Ms. Martucci's testimony was not legal error and does not warrant a new trial.

### (3) Jurors' Discussion of Evidence while Prejudiced Juror, who was Ultimately Dismissed as an Alternate, Remained on Jury

Next, Sampson claims that "[t]he jury began deliberating before the end of the case." ECF No. 109, PageID.1984. On January 29, 2024, a juror gave one of this Court's law clerks a note, which asked "[i]f the defense objects to the photo of Mr. Sampson's tattoos taken in pursuant of the search warrant, should the jury disregard that evidence or take it into consideration." ECF No. 107, PageID.1826. The Court called the jury into the courtroom and indicated: "I'm a little concerned about the jurors thinking and really talking about the evidence, and I'm going to say something about that at this point, too, because I haven't instructed them to deliberate." *Id.* at 1827.

Sampson believes "[t]he problem with the jurors discussing the evidence before they were instructed to deliberate is amplified by the fact that a potentially biased juror was still seated when this discussion took place." ECF No. 109, PageID.1985; *see* ECF No. 106, PageID.1667 (indicating that a juror who expressed

hesitation in committing to being fair and impartial after witnessing MV-1's outburst would be excused as an alternate before deliberations began). Though he did not make the request, Sampson avers that "[t]he Court did not seek to ascertain the extent of the premature discussions of the evidence or seek to find out whether the prejudiced juror participated in those discussions." ECF No. 109, PageID.1985.

Prior to MV-1's testimony, the Court instructed the jury that:

Before you retire to deliberate and at the close of the case, I will instruct you on the rules of law that you must follow and apply in deciding upon your verdict. Give careful attention to the testimony and evidence which is presented during the trial. However, do not form or express any opinion about the case until you have heard all of the evidence and you have had the benefit of closing arguments of the lawyers and my instructions on the applicable law. . . .

After the evidence has been completed and the arguments and the instructions have been given to you, you will be asked to go to the jury room to deliberate on your verdict. You will be asked to determine the facts from all of the testimony that you will have heard and any other evidence that is admitted. You are the sole and exclusive judges of the facts. Neither I, nor anyone else may invade your province.

ECF No. 118, PageID.2066, 2072.

The Court instructed the jurors not to deliberate until they heard all the evidence and were instructed on the applicable law by the Court. As such, the question submitted by the juror does not indicate that all jurors began prematurely discussing the evidence. Rather, it suggests that a single juror started considering the evidence before deliberations began. And upon receiving the note, the Court immediately instructed the jury as follows: ". . . at the end of case I'm going to give

you all quite a few jury instructions dealing with all these kinds of issues, and so, I hope you all aren't talking about the case or having discussions about it, because that's prohibited." *Id*. at 1828. On this basis, the Court finds that no substantial legal error occurred as result of the juror question and Defendant fails to show that a new trial is warranted.

### (4) Prosecutorial Misconduct / *Napue* Violations

Next, Sampson avers that his due process rights were violated because "the government failed to correct [MV-1's] false testimony concerning her access to Wi-Fi while she was at the MNM Motel." ECF No. 109, PageID.1985. Sampson believes the Government "also elicited testimony that [MV-1] did not know what she was going to be doing to make money until she was at the MNM motel." *Id*.

The Supreme Court has recognized that due process is denied where the prosecution, "although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). To establish prosecutorial misconduct or denial of due process, the defendant "must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.1989). A false statement is material under this standard, and "[a] new trial is required[,] if the false testimony could in any reasonable

likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154, 92 S.Ct. 763.

Sampson believes that MV-1's alleged false statement is material because the Court recognized during trial that her credibility was "really the key issue in this case[,]" and "[t]he government was never forced to correct the testimony or made to acknowledge that its main witness was not credible given that she repeatedly lied on the stand despite having taken an oath to tell the truth." ECF No. 109, PageID.1986. Assuming *arguendo* that the statements were false, Sampson's argument fails because he does not explain how—in light of the other evidence and testimony adduced at trial—correction of MV-1's testimony or an acknowledgement regarding the untruthfulness of certain statements she made would have had a reasonable likelihood of affecting the verdict of the jury.

The Court declines to find that prosecutorial misconduct and *Napue* violations occurred to such an extent that Sampson's due process rights were violated.

### (5) Inaccurate Transcripts

Sampson re-asserts his argument "concerning the inaccurate transcript contained in his written motion for a mistrial." ECF No. 109, PageID.1987; *See* ECF No. 93. Specifically, he believes that the accuracy of the trial transcripts could affect his right to appeal. *Id*. He attributes these concerns to his belief that the January 25, 2024, transcript did not capture all the language MV-1 used during her outburst on

that day, including her use of a racial epithet. As stated in the Court's Opinion and

Order Denying Defendant's Motion for Declaration of Mistrial, [ECF No. 103],

> the Court polled the jurors individually without the other jurors being present in the courtroom. It asked each juror what they heard MV-1 say during her outburst, what was the worst thing they heard her say, it asked each of the jurors if they could remain fair and impartial, and it instructed each juror not to discuss the outburst or the court's line questioning about it with the other jurors. Only four of the fourteen jurors heard the racial epithet, and all of them, except one, indicated—without hesitation—that they could remain fair and impartial. The Court excused the only juror who expressed hesitation when asked if she could remain impartial.

ECF No. 103, PageID.1281-82.

The results of the polling are captured on the record. Each juror told the Court

exactly what they heard during MV-1's outburst. Thus, the record is sufficient for

the appellate court to assess the prejudicial nature of MV-1's outburst. Further, as

noted in the Court's previous order, this "rare breakdown in the transcription process

resulted from a unique emotional outburst that interfered with the transcription

during an isolated incident at trial. No further outbursts have taken place and there

is no reason to believe that any of the transcripts written during other times at trial

are inaccurate." *Id*. Though the transcript of MV-1's testimony does not capture her

use of a racial epithet, and it does not say that her outburst continued when she exited

the courtroom, this inaccuracy does not warrant a new trial.

## IV.   Conclusion

Sampson's Rule 29 and 33 motions are denied.

**IT IS SO ORDERED**.

Dated:        May 2, 2024

s/Gershwin A. Drain
HON. GERSHWIN A. DRAIN
United States District Court Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
April 29, 2024 by electronic and/or ordinary mail.

/s/
Deputy Clerk
